# SunTrust

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 04-06-2005 | 04-06-2025 | **** | | | 015323 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MARLIN F REKOW
SHEILA A REKOW
64 GORDON CLAN LN
HUNTLY, VA 226403103

**Lender:** SunTrust Bank
CLSC - Richmond
1001 Semmes Ave
Richmond, VA 23224

**CREDIT LIMIT: $250,000.00**

**DATE OF AGREEMENT: April 6, 2005**

**Introduction.** This ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through SunTrust Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean SunTrust Bank. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay SunTrust Bank, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Security Deed" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower or authorized signer, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: The Account establishes a line of credit upon which Borrower may request Advances for a period of (10) years ("the Draw Period"). The Account shall be payable in full no later than twenty (20) years from the date of execution of this Agreement ("the Maturity"), the last ten (10) years before Maturity being the repayment period ("Repayment Period"). The Bank in its sole discretion may extend the Draw Period. If the Draw Period is extended, Borrower shall be notified and the Repayment Period shall be shortened by the same number of years that the Draw Period is extended.

**Access.** The Account may be accessed by (i) use of a draft ("Access 3 Check") supplied by Bank; (ii) use of an Access 3 Equity Line credit card ("Access 3 Credit Card") issued by Bank; (iii) Bank to provide overdraft coverage,(iv) other means Bank may authorize from time to time; or (v) any other advancement of funds by Bank on Borrower's behalf. Access 3 Credit Cards will not be offered in all states.

**Advances.** Borrower may obtain an Advance on the Account from time to time up to the available Credit Limit. The available credit for Advances is the Credit Limit, minus the sum of all unpaid Advances (including Advances initiated, but not yet posted to the Account) and any other charges posted to the Account. The minimum amount of any Access 3 Check Advance shall be $250.00, however, if Borrower chooses to repay an Access 3 Check Advance under Option 3 defined below, the minimum Advance amount shall be $5,000.00. In addition, Borrower is limited to five (5) outstanding Option 3 advances at any one time. If Borrower presents an Advance which would exceed the limitation, Bank may refuse to honor the Advance or may in its discretion pay the Advance and require repayment of the Advance under one of the other repayment options. No minimum Advance amount shall be required by Bank for purchases made with the Access 3 Credit Card. Borrower may make up to eight (8) Access 3 Credit Card transactions daily, five (5) of which may be ATM cash advances, with a maximum aggregate daily total of $1,200.00. If Borrower elects overdraft coverage as provided in paragraph 4, such Advances shall be in $100.00 increments.

Borrower may not access the Account when such Advance will exceed Borrower's available Credit Limit, result in a default under this Agreement, or would violate any law. Bank may refuse to make any requested Advance, including but not limited to, returning unpaid any Access 3 Check on the Account or refusing authorization for an Access 3 Credit Card transaction if (i) the request does not conform to the requirements of this paragraph; or (ii) at the time of the request, outstanding Account balance, as reflected by Bank's records, exceeds (or upon making the Advance would exceed) the Credit Limit; or (iii) the ability to make Advances has been suspended as provided for in this Agreement. However, Bank, at its option, may pay any Advance which will exceed the Credit Limit and Borrower will pay any amount over the Credit Limit in the manner Bank requests.

**Overdraft Coverage.** Bank is authorized to advance funds from the Access 3 Account to provide overdraft coverage for Account Number _____ maintained by Borrower with Bank ("Bank Account"). Whenever Borrower writes checks or otherwise creates debits which overdraw the Bank Account, Bank will make an Advance from the Access 3 Account in $100.00 increments to the Bank Account. If the Credit Limit on the Access 3 Account is not sufficient to cover the entire overdraft, but is sufficient to cover any one or more items creating such overdraft, Bank will make an Advance from the Access 3 Account, up to the amount of the available Credit Limit, in order to pay such item(s). If Bank makes an Advance which exceeds the Credit Limit, Borrower will pay any amount over the Credit Limit in the manner Bank requests. In the event that the Bank Account is held jointly with other individuals ("Joint Account Holder"), overdrafts on the Bank Account created by the Joint Account Holder will be provided overdraft coverage as prescribed in this paragraph.

**Interest Rate and Repayment Options.** For the first **Three (3)** month period following the date of this Agreement the ANNUAL PERCENTAGE RATE, for Option 1 and Option 2 draws shall be fixed at the rate of **3.990%**. The Current Daily Periodic Rate is **0.01093%** and the corresponding ANNUAL PERCENTAGE RATE is **3.990%**. The ANNUAL PERCENTAGE RATE for Option 3 Advances shall not be subject to this promotional pricing. After the expiration of this **Three (3)** month period, the ANNUAL PERCENTAGE RATE will be variable and calculated as described below.

The **ANNUAL PERCENTAGE RATE** on Option 1 and Option 2 Advances shall be calculated at a rate equal to the *Wall Street Journal* Prime Rate **+0.250%**. The maximum ANNUAL PERCENTAGE RATE will not exceed **18%** per annum. Options 1 and 2 have a variable rate of interest and the ANNUAL PERCENTAGE RATE can change as a result. The ANNUAL PERCENTAGE RATE for Option 3 and the Repayment Period shall be a fixed rate calculated at the time of the Advance at a rate equal to the 3 year Interest Rate Swap Index plus **+3.250%**, for Advances with a term of sixty (60) months or less. For Advances with a term of seventy two (72) months or more the rate is determined at the time of the draw using the 5 year Interest Rate Swap Index **+3.250%**. The current value of both indices is published weekly by the Federal Reserve Board in Statistical Release H. 15(519) and can also be found on the Federal Reserve's web page at www.federalreserve.gov/releases/h15. The maximum ANNUAL PERCENTAGE RATE will not exceed **18%** per annum. At the time of an Access 3 Check Advance, Borrower will choose a repayment option which will apply only during the Draw Period. By the payment due date shown on the monthly statement ("the Periodic Statement"), Borrower agrees to pay monthly either (i) the total amount owing on the closing date as shown on the Periodic Statement (the "New Balance") or (ii) any portion of the New Balance, so long as Borrower pays at least a "Minimum Payment" which is the sum of the minimum payments for each of the three (3) Options as specifically set forth below, plus any applicable insurance premiums, late charges, and/or miscellaneous fees as set forth on the Periodic Statement. In addition, if the New Balance exceeds the Credit Limit, Borrower will pay the amount indicated on the Periodic Statement, to reduce the Account balance to within the Credit Limit. All payments must be made in United States dollars and must be drawn on a financial institution located in the United States.

**Option 1 - Revolving Line of Credit**

The minimum payment due for funds advanced under this Option shall be 1.5% of the balance for Option 1. All Advances made by Access 3 Credit Card or overdraft protection will be governed by and repaid under Option 1.

**Option 2 - Interest Only**

The minimum payment due for funds advanced under this Option shall be the accrued interest on the balance for Option 2.

**Option 3 - Fixed Rate/Fixed Term**

The **ANNUAL PERCENTAGE RATE** on Advances made under this feature shall be fixed at the time the Advance is posted to th[e Account.] Borrower will select a term of twelve (12), twenty four (24), thirty six (36), forty eight (48), sixty (60), seventy two (72), eight[y four (84),] ninety six (96), one hundred eight (108), or one hundred twenty (120) months by noting same on the Access 3 Check at the [time of the] Advance. If Borrower does not specify a term, the term for the Advance shall be one hundred twenty (120) months. The paym[ent will be] based upon the amount of the draw, the interest rate, and the repayment term selected. Each draw taken under this option shall b[e]

Any areas where this is present represent redacted information.

EXHIBIT

A

ALL-STATE LEGAL®

to establish the payment amount. Any remaining balance at the end of the term shall be converted to Option 1 for repayment. Due to new check processing procedures, if Bank cannot determine the repayment period selected, the term shall default to a one hundred twenty (120) month repayment period.

**Processing Fee.** When Borrower has chosen to repay an Advance under Option 3, a $15 fee shall be assessed to the Account for processing the Option 3 Advance.

**Repayment Period.** The **ANNUAL PERCENTAGE RATE** for the Repayment Period shall be fixed at the expiration of the Draw Period based on the *Wall Street Journal* Prime rate plus the margin disclosed above for Option 1 and Option 2 Advances. The term for the repayment of the outstanding balance will be ten (10) years. The monthly payment amount will be established using a straight amortization and will be based upon the balance, the fixed interest rate and the ten (10) year term. The monthly payment will also include any applicable insurance premiums, late charges, and/or miscellaneous fees dues. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable at the end of this term.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to credit insurance, then to any late charges and loan fees, then to any unpaid interest, and then to the balance of unpaid principal.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 8:00 a.m. Eastern Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to two (2) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Two Hundred Fifty Thousand & 00/100 Dollars ($250,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. We reserve the right to pay or return any requested Advance that exceeds your credit limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Security Deed or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Security Deed for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your property. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your property. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Access 3 Equity Line Check" that we will supply to you.

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Access 3 Equity Line Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Access 3 Equity Line Check.

**Post-dated Checks.** Your Access 3 Equity Line Check is post-dated. If a post-dated Access 3 Equity Line Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Access 3 Equity Line Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Access 3 Equity Line Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Access 3 Equity Line Check.

**Transaction Violation.** Your Access 3 Equity Line Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Access 3 Equity Line Check.

If we pay any Access 3 Equity Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Access 3 Equity Line Check. The Access 3 Equity Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Access 3 Equity Line Checks along with your periodic billing statements; however, your use of each Access 3 Equity Line Check will be reflected on your periodic statement as a credit advance. We do not "certify" Access 3 Equity Line Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Access 3 Equity Line Check and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Access 3 Equity Line Checks and requesting an advance in person.

**Authorized Signers.** The words "Authorized Signer" on Access 3 Equity Line Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Access 3 Equity Line Checks.** If you lose your Access 3 Equity Line Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (888) 461-8862. You also can notify us at Loan Servicing PO Box 85160, Richmond, VA 23286-9079.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Credit Line Deed of Trust dated April 6, 2005, to a trustee in favor of us on real property located in RAPPAHANNOCK COUNTY, Commonwealth of Virginia. The Real Property or its address is commonly known as 64 GORDON CLAN LN, HUNTLY, VA 226403103. The collateral must be your primary or secondary residence.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance, and flood insurance if applicable, through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Security Deed, we may purchase insurance to protect our own interest, but are not required to do so, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things. The insurance we purchase may be much more expensive and will, in most cases, provide less coverage than insurance you could buy.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account, including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement, unless the activity is less than $1.00 or in which a finance charge has been imposed. Bank will safekeep the paid Access 3 Checks. Bank will make photocopies of Access 3 Checks and other instruments upon request. (If such request is not made in connection with a billing error inquiry, it may be subject to Research and Photocopy charges as described on below.)

Each Access 3 Check will be deemed to be an item for purposes of the Uniform Commercial Code ("UCC") of the state in which Bank is located and the time periods and other requirements for examining Periodic Statements and reporting improper entries will begin from the time Periodic

Any areas where this is present represent redacted information.

Statements are sent or made available to Borrower. Bank assumes no responsibility for entries included on Periodic Statements not received unless Borrower gives notice within sixty (60) days of the date on which Periodic Statement is customarily mailed that it was not received.

The rules for stopping payment on Access 3 Checks shall be the same as the Bank's rules for stopping payment on checks written on deposit accounts.

The statement will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." The Finance Charge ("Finance Charge") shall be the sum of the Cash Advance Fee described on Page 3 and the Periodic Finance Charge ("Periodic Finance Charge"). A Periodic Finance Charge will be imposed on the Account and will be shown on the next Periodic Statement even if the New Balance was paid in full on or before the payment due date of the prior Periodic Statement. Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

When FINANCE CHARGES Begin to Accrue. Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed. A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the Average Daily Balance. For each Billing Cycle, the Periodic Finance Charge begins to accrue on Access 3 Check Advances on the day the Check is received by the Bank for payment and transaction. Bank calculates the Periodic Finance Charge on Options 1 and 2 by applying the Daily Periodic Rate to the average daily balance. To determine the "Daily Balance," take the beginning balance of the three (3) Options each day starting with the New Balance from the last Periodic Statement, plus all purchases, cash advances, Access 3 Checks, or any other Advances posted through that day, minus any unpaid Finance Charge, other charges, payments or other credits posted through that day. The "Average Daily Balance" is the sum of all the Daily Balances for the Billing Cycle divided by the actual number of days in the Billing Cycle. The Periodic Finance Charge for Option 3 will be calculated using straight loan amortization for each Advance. The Periodic minimum FINANCE CHARGE for the Account is $.50. The Periodic Finance Charge for the Account is the sum of the Periodic Finance Charges for the three (3) Options.

You also agree to pay FINANCE CHARGES, not calculated by applying a Periodic Rate, as set forth below:

ATM Transaction Fee. You will be charged an Automated Teller Machine ("ATM") transaction fee of $5.00 when you obtain a credit advance at any of our designated ATM locations.

Annual Fee. A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: beginning on the first anniversary of the opening of the Account, which may be waived if usage results in interest accrued that exceeds $100.

Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE. We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime Rate. The corresponding ANNUAL PERCENTAGE RATE and the Daily Periodic Rate for Options 1 and 2, for each Billing Cycle will depend upon the Prime Rate. The "Prime Rate" means the per annum rate of interest published from time to time by *The Wall Street Journal* in its "Money Rates" listings, as the Prime Rate on the day preceding the first day of the Billing Cycle. In the event that on any particular day *The Wall Street Journal* publishes more than one Prime Rate, for purposes of this Agreement, the Prime Rate shall mean the highest Prime Rate so published. The Prime and Daily Periodic Rate for Option 3 for each Billing Cycle will depend upon the term selected for repayment. If the term is sixty (60) months or less, the rate is determined at the time of the draw using the 3 year Interest Rate Swap Index **+3.250%**. In the event of a term of seventy two (72) months or more the rate is determined at the time of the draw using the 5 year Interest Rate Swap Index **+3.250%**. The current values of both indices are published weekly by the Federal Reserve Board in Statistical Release H. 15(519) and on the Federal Reserve's web page at www.federalreserve.gov/releases/h15. The number of days in the Billing Cycle and the statement closing date will be shown on each Periodic Statement. For example, if the statement closing date is September 1st and there are thirty (30) days in the Billing Cycle, to calculate the first day in the Billing Cycle, subtract thirty (30) days from September 1st, to arrive at August 2nd. This Billing Cycle would begin August 2nd and end September 1st. So if the first day of the Billing Cycle is August 2nd, the corresponding ANNUAL PERCENTAGE RATE for that Billing Cycle will equal the Prime Rate in effect on August 1st, plus or minus the margin. The Daily Periodic Rate equals the Prime Rate plus or minus the margin divided by actual number of days in the year. The corresponding ANNUAL PERCENTAGE RATE and Daily Periodic Rate may increase or decrease according to increases or decreases in the Prime Rate. If the corresponding ANNUAL PERCENTAGE RATE and Daily Periodic Rate increase, the Periodic Finance Charge and Minimum Payment may increase. The increases and decreases caused by changes in the Prime Rate will take effect on the first day of each succeeding Billing Cycle and will remain in effect for the entire Billing Cycle. The corresponding ANNUAL PERCENTAGE RATE and Daily Periodic Rate will not change during the course of any one Billing Cycle. For Options 1 and 2, the current Daily Periodic Rate is **0.01644%** and the corresponding ANNUAL PERCENTAGE RATE is **6.00000%**. These rates are based upon the current Prime Rate of **5.75000%** which was in effect as of 04-06-2005. For Option 3 Advances with a term of sixty (60) months or less, the current Daily Periodic Rate is **0.02049%** and the corresponding ANNUAL PERCENTAGE RATE is **7.48000%**. These rates are based upon the 3 year Interest Rate Swap Index which is currently **4.23000%**. For Option 3 Advances with a term of seventy two (72) months or more, the current Daily Periodic Rate is **0.02121%** and the corresponding ANNUAL PERCENTAGE RATE is **7.74000%**. These rates are based upon the 5 year Interest Rate Swap Index which is currently **4.49000%**. The corresponding ANNUAL PERCENTAGE RATE and Daily Periodic Rate applicable to the first Billing Cycle of the Account may differ from the disclosure above. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

Negative Amortization. Under some circumstances, your payments will not cover the finance charges that accrue and negative amortization will occur. Negative amortization will increase the amount that you owe us and reduce your equity in your home.

Conditions Under Which Other Charges May Be Imposed. You agree to pay all the other fees and charges related to your Credit Line as set forth below:

Returned Items. You may be charged $30.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

Fee to Stop Payment. Your Credit Line Account may be charged $30.00 when you request a stop payment on your Account.

Overlimit Charge. Your Credit Line Account may be charged $25.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Access 3 Equity Line Check in excess of your available balance.

Charge for Advance Less than Minimum. Your Credit Line Account may be charged $25.00 if you obtain a credit advance for less than the minimum advance amount disclosed above, whether we decide to honor it or whether we refuse to honor it, unless applicable law requires a lower charge or prohibits any charge.

Miscellaneous Photocopying. If you request a copy of any document, we may charge your Credit Line Account $5.00 per check copy, $5.00 per statement copy and $25.00 per hour of extensive research time for the time it takes us to locate, copy, and mail the document to you. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.

Late Charge. Your payment may be late if it is not received by us within 7 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the payment.

Any areas where this is present represent redacted information.

**Closing Costs.** You agree to pay us the settlement charges ("Closing Costs") set forth below in connection with this Account, to include but not be limited to, costs or fees for the preparation, execution, and recording of the Security Instrument securing this Account. In addition, if allowed by applicable law, you agree to pay the cost of recording the release or satisfaction of the Security Instrument which shall be added to the payoff.

| | |
|---|---|
| **RECORDING FEE | $878.50 |
| **FLD DETERM /EFL | $3.10 |
| **TITLE INS | $34.00 |
| **TITLE SCH | $35.00 |

We may agree to pay some or all of the Closing Costs on your behalf at, before or after the time of settlement; however, you shall reimburse us for the Closing Costs paid by us on your behalf if you pay the Account Balance in full and close the Account within three (3) years of opening the Account. In such event, we may add this amount to your Account Balance at the time of payoff, or if requested you will pay us directly upon demand. A double asterisk before the fee description indicates that the Closing Cost was paid by the Bank, and subject to reimbursement as described herein. Accordingly, you agree to reimburse us in the amount of $950.60 if you pay the Account Balance in full and close the Account within three (3) years of opening the Account.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of any person liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, the use of funds or the dwelling for prohibited purposes, or if title to the property is taken through eminent domain.

**Default Remedies.** Upon default, we may exercise any and all rights contained in this Agreement, the Security Instrument or any other rights provided to us by law, but not limited to, the right to sell the Real Property at a public auction or as provided by law. We may waive or decline to enforce any of our rights under this Agreement at any time without affecting any of our other rights under this Agreement. Furthermore, upon default, your authorization to initiate Advances on the Account shall terminate and we may return any Access 3 Checks unpaid or decline Access 3 Credit Card charges or cash advances, without liability to you and without prior notification.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by government authority that continued advances may constitute an unsafe and unsound business practice.

(7) We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

If we temporarily prohibit additional advances on the account and/or reduce the Credit Limit based upon any of the foregoing situations, we will provide you with written notice of said action not later than three (3) business days after action is taken. The notice will explain how you can request reinstatement of credit privileges.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our date processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original index becomes unavailable.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees or reasonable attorneys' fees as allowed by law, if any sums owing under this Agreement are collected by or through an attorney at law, whether or not there is a lawsuit, and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Access 3 Equity Line Checks and any other access devices. Any use of Access 3 Equity Line Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Access 3 Equity Line Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement (except for our obligation to make advances).

We may at our option allow you to continue to make regular monthly payments or to restructure the amount owed in a mutually agreeable manner, or may require you to pay the entire unpaid balance in full.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: SunTrust Bank, P.O. Box 27161 Richmond, VA 23261-7161.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly of any change in your mailing address, any change in financial condition, or of any unauthorized use of the Account. As a material obligation under this Agreement, you will update the information and furnish us with additional financial aid or other information as we may request. You will immediately telephone us and confirm by letter if any Access 3 Checks

Any areas where this is present represent redacted information.

or the Access 3 Credit Card are lost or stolen, and upon failure to do so, you will assume full responsibility if we should, without negligence, pay such Access 3 Checks. At the time of this Agreement, the telephone number for reporting lost or stolen checks is (888) 461-8862. Your liability for the unauthorized use of the Access 3 Credit Card shall not exceed the lesser of $50.00 or the amount of money, property, labor or services obtained by the unauthorized use of the Access 3 Credit Card prior to the time you notify us of the loss or theft of the card. We shall not be responsible to you in any manner if anyone refuses to accept an Access 3 Check as a manner of payment.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Deed of Trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Homestead Waiver.** You, to the extent permitted by law, hereby waive your homestead exemption with respect to all property subject to any security interest or lien granted to secure this loan.

**Jury Waiver.** We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**INFORMATION REPORTED TO CREDIT BUREAUS. UNDER THE FAIR CREDIT REPORTING ACT, YOU HAVE THE RIGHT TO NOTIFY US IF YOU BELIEVE WE HAVE REPORTED INACCURATE INFORMATION ABOUT YOUR ACCOUNT TO A CREDIT BUREAU OR CONSUMER REPORTING AGENCY. SUCH NOTICES SHOULD BE SENT IN WRITING AND INCLUDE YOUR COMPLETE NAME, CURRENT ADDRESS, SOCIAL SECURITY NUMBER, TELEPHONE NUMBER, ACCOUNT NUMBER, TYPE OF ACCOUNT, SPECIFIC ITEM OF DISPUTE AND THE REASON WHY YOU BELIEVE THE INFORMATION REPORTED IS IN ERROR. SEND YOUR NOTICE TO: SUNTRUST BANK, P.O. BOX 85052, RICHMOND, VA 23285-5052. .**

**Arbitration Clause.** Upon the demand of either party hereto, any action, claim, dispute, or controversy arising from or relating to this agreement or the relationships which result from this agreement (hereinafter "Claim" or "Claims"), including Claims by either party against the employees, officers, directors, agents, successors, heirs, or assigns of the other party, including Claims regarding the applicability, interpretation, or validity of this arbitration clause and/or the underlying agreement, shall be resolved by individual (not class or class-wide) binding arbitration, except as specifically provided herein. The individual arbitration proceedings shall be governed by the rules, procedures and fees of the National Arbitration Forum or the American Arbitration Association in effect at the time the Claim is made or filed. Borrower has the right to select which of these arbitration forums to use, but if Borrower does not make a timely selection, Lender may make the choice. Any arbitration hearing will take place at a location reasonably convenient to Borrower. At Borrower's written request, Lender or the holder of the promissory note or this agreement will advance any arbitration filing fee or administrative and hearing fees which Borrower is required to pay to pursue a Claim subject to the arbitrator ultimately deciding who must be responsible for paying those fees. In no event will Borrower be required to reimburse Lender or the holder of the promissory note or this agreement for any filing, administrative or hearing fees in an amount greater than what the costs would have been had the Claim been resolved in a court with jurisdiction. The parties agree that the arbitrator shall have all powers provided by law and this agreement. These powers include all legal and equitable remedies, including but not limited to the power to decide money damages and issue declaratory or injunctive relief. Judgment upon an arbitration award may be entered in any court having jurisdiction. A demand for arbitration must be made before or after the beginning of any legal proceeding; however, any demand made after the initiation of a legal proceeding must be made within sixty (60) days following the service of a complaint, third-party complaint, cross-claim, or counterclaim.

The parties acknowledge and agree that this agreement to arbitrate is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT OR OPPORTUNITY TO INDIVIDUALLY, OR AS PART OF A CLASS ACTION, LITIGATE CLAIMS IN COURT REGARDING THIS AGREEMENT OR THIS ARBITRATION CLAUSE AND CHOOSE INDIVIDUAL (NOT CLASS) BINDING ARBITRATION TO RESOLVE ALL CLAIMS AND SHALL INCLUDE NO OTHER (EVEN IDENTICAL) DISPUTE WITH ANOTHER CUSTOMER OR BORROWER, EXCEPT AS SPECIFICALLY PROVIDED HEREIN.

This arbitration agreement, unless prohibited by applicable law, applies to all Claims specified above, whether now in existence or arising in the future and shall survive the voluntary payment of debt in full, any bankruptcy, or sale of the debt, EXCEPT nothing in this arbitration agreement shall be construed to prevent either party from using self-help repossession, replevin, judicial or non-judicial foreclosure or any other form of relief allowed by law to enforce a security interest. The institution and maintenance of such litigation shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration pursuant to this arbitration agreement.

**Governing Law.** This Agreement will be governed by and interpreted in accordance with federal law and the laws of the Commonwealth of Virginia. This Agreement has been accepted by us in the Commonwealth of Virginia.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Deed of Trust, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Deed of Trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," given with the application.

This Agreement is dated April 6, 2005.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X _____ (Seal)
MARLIN F REKOW

X _____ (Seal)
SHEILA A REKOW

Any areas where this is present
represent redacted information.


# BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### Notify us in case of errors or questions about your bill.

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> **SunTrust Bank**
> **Credit Line**
> **P.O. Box 85160**
> **Richmond, VA 23285-5160**

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

### Your rights and our responsibilities after we receive your written notice.

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rules for Credit Card Purchases**

If you have a problem with the quality of property or services that you purchased with a credit card, and have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or service. There are two limitations on this right:

(a)     You must have made the purchase in your home state or, if not within your home state, within one hundred (100) miles of your current mailing address; and

(b)     The purchase price must have been more than $50.00.

The limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

LASER PRO Lending, Ver. 5.24.10.202  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - VA  I:\LPRO\CFI\LPL\G75.FC  PR-3/6844  M5-ACCN

Any areas where this is present represent redacted information.

## SunTrust

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $660,000.00 | 04-18-2006 | 04-18-2026 | *** | | | | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** SHEILA A REKOW
MARLIN F REKOW
64 GORDON CLAN LN
HUNTLY, VA 226403103

**Lender:** SunTrust Bank
CLSC - Richmond
1001 Semmes Ave
Richmond, VA 23224

**CREDIT LIMIT: $660,000.00**  **DATE OF AGREEMENT: April 18, 2006**

**Introduction.** This ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through SunTrust Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean SunTrust Bank. You agree to the following terms and conditions:

**Promise to Pay.** You promise to pay SunTrust Bank (SunTrust Bank, its successors and assigns, in addition to the terms referenced above, may also be referred to as "Bank" herein), or order, the total of all credit advances ("Advances") and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement and/or under the security instrument ("Security Deed") which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to suspend, cancel or terminate the Credit Line, to request and receive credit Advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: The Account establishes a line of credit upon which Borrower may request Advances for a period of (10) years ("the Draw Period"), each Advance to be repaid under one of the three options described herein ("Option 1 Advances", "Option 2 Advances", or "Option 3 Advances"). The Account shall be payable in full no later than twenty (20) years from the date of execution of this Agreement ("the Maturity"), the last ten (10) years before Maturity being the full and final repayment period for Option 1 Advances and Option 2 Advances ("Repayment Period"). The Bank in its sole discretion may extend the Draw Period. If the Draw Period is extended, Borrower shall be notified and the Repayment Period shall be shortened by the same period of time that the Draw Period is extended.

**Access.** During the Draw Period, the Account may be accessed by (i) use of a draft ("Access 3 Check") supplied by Bank; (ii) use of an Access 3 Equity Line credit card ("Access 3 Credit Card") issued by Bank; (iii) Bank may provide overdraft coverage; (iv) other means Bank may authorize from time to time; or (v) any other advancement of funds by Bank on Borrower's behalf. Access 3 Credit Cards will not be offered in all states. Each of the access methods described above will only be available if allowed by applicable law.

**Initial Advance.** "Initial Advance" means the amount of money you will obtain at closing toward the purchase of your home, if applicable, or the first disbursement you are requesting to be extended on your Credit Line following the expiration of any applicable rescission period. If an Initial Advance is allowed by us at origination/closing for the purchase of your home, the minimum Initial Advance for that purpose must be at least $5,000.00.

**Subsequent Advances.** During the Draw Period, Borrower may obtain an Advance on the Account from time to time up to the available Credit Limit. The available credit for Advances is the Credit Limit, minus the sum of all unpaid Advances (including Advances initiated, but not yet posted to the Account) and any other charges posted to the Account. The minimum amount of any Access 3 Check Advance shall be $250.00, however, if Borrower chooses to repay an Access 3 Check Advance under Option 3 defined below, the minimum Advance amount shall be $5,000.00. In addition, Borrower is limited to five (5) outstanding Option 3 Advances at any one time. If Borrower presents an Advance which would exceed or violate these limitations, Bank may refuse to honor the Advance or may in its discretion pay the Advance and require repayment of the Advance under one of the other repayment options. No minimum Advance amount shall be required by Bank for purchases made with the Access 3 Credit Card. Borrower may make up to eight (8) Access 3 Credit Card transactions daily, five (5) of which may be ATM cash advances, with a maximum aggregate daily total of $1,200.00. If Borrower elects overdraft coverage as provided in this Agreement, such Advances shall be in $100.00 increments.

Borrower will not access the Account when such Advance will exceed Borrower's available Credit Limit, result in a default under this Agreement, or would violate any applicable law. Bank may refuse to make any requested Advance, including but not limited to, returning unpaid any Access 3 Check on the Account or refusing authorization for an Access 3 Credit Card transaction if (i) the request does not conform to the requirements of this Agreement; or (ii) at the time of the request, the outstanding Account balance, as reflected by Bank's records, exceeds (or upon making the Advance would exceed) the Credit Limit; or (iii) the ability to make Advances has been suspended, canceled or terminated as provided for in this Agreement. However, Bank, at its option, may pay any such Advance, and Borrower will pay any amount over the Credit Limit in the manner Bank requests.

**Overdraft Coverage.** Bank is authorized to advance funds from the Access 3 Account to provide overdraft coverage for Account Number _____ maintained by Borrower with Bank ("Bank Account"). Whenever Borrower writes checks or otherwise creates debits which overdraw the Bank Account, Bank will make an Advance from the Access 3 Account in $100.00 increments to the Bank Account. If the Credit Limit on the Access 3 Account is not sufficient to cover the entire overdraft, but is sufficient to cover any one or more items creating such overdraft, Bank will make an Advance from the Access 3 Account, up to the amount of the available Credit Limit, in order to pay such item(s). If Bank makes an Advance which exceeds the Credit Limit, Borrower will pay any amount over the Credit Limit in the manner Bank requests. In the event that the Bank Account is held jointly with other individuals ("Joint Account Holder"), overdrafts on the Bank Account created by the Joint Account Holder will be provided overdraft coverage as prescribed in this paragraph.

**ANNUAL PERCENTAGE RATES AND PAYMENT TERMS DURING THE DRAW PERIOD**

The **ANNUAL PERCENTAGE RATE** on Option 1 and Option 2 Advances shall be calculated at a rate equal to *The Wall Street Journal* Prime Rate **+0.000%**. The maximum **ANNUAL PERCENTAGE RATE** for Option 1 and Option 2 Advances will not exceed **18%** per annum. During the Draw Period, Options 1 and 2 Advances have a variable rate of interest and the **ANNUAL PERCENTAGE RATE** can change as a result.

At the time of an Access 3 Check Advance taken under Option 3 (an "Option 3 Advance"), Borrower will choose a repayment term for each such Advance (the "Option 3 Repayment Term" which is more fully described below). The **ANNUAL PERCENTAGE RATE** for each Option 3 Repayment Term shall be a fixed rate calculated at the time of the Advance as more fully described in the Section herein entitled "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE". For Option 3 Advances with an Option 3 Repayment Term of sixty (60) months or less, the fixed **ANNUAL PERCENTAGE RATE** shall be calculated at the time of the Advance at a rate equal to the 3-year Interest Rate Swap Index **+3.250%**. For Option 3 Advances with an Option 3 Repayment Term of seventy-two (72) months or more, the fixed **ANNUAL PERCENTAGE RATE** shall be calculated at the time of the Advance at a rate equal to the 5-year Interest Rate Swap Index **+3.250%**. The current value of both indices is published weekly by the Federal Reserve Board in Statistical Release H. 15(519) and can also be found on the Internet on the Federal Reserve's web page at www.federalreserve.gov/releases/h15. The maximum **ANNUAL PERCENTAGE RATE** for Option 3 Advances will not exceed **18%** per annum.

During the Draw Period, by the payment due date shown on the monthly statement ("the Periodic Statement"), Borrower agrees to pay monthly either (i) the total amount owing as shown on the Periodic Statement (the "New Balance") or (ii) any portion of the New Balance, Borrower pays at least a "Minimum Payment" which is the sum of the minimum payments for each of the three (3) Options as set forth below, plus any applicable insurance premiums, debt cancellation or suspension charges, late charges, and/or miscellaneous charges, set forth on the Periodic Statement. In addition, if the New Balance exceeds the Credit Limit, Borrower will pay the amount indicated on the Periodic Statement to reduce the Account balance to within the Credit Limit. All payments must be made in United States dollars drawn on a financial institution located in the United States.

**Option 1 - Revolving Line of Credit**

During the Draw Period, the minimum monthly payment due for funds advanced under this Option shall be 1.5% of the total balance



EXHIBIT
B
ALL-STATE LEGAL®

Any areas where this is present represent redacted information.

1. All Advances made by Access 3 Credit Card or for overdraft protection will be governed by and repaid under Option 1.

**Option 2 - Interest Only**

During the Draw Period, the minimum monthly payment due for funds advanced under this Option shall be the accrued interest on the balances for Option 2. Minimum payments made on balances under this Option will not result in any reduction of the principal balance.

**Option 3 - Fixed Rate/Fixed Term**

At the time of an Advance under Option 3, Borrower will select a repayment term of twelve (12), twenty-four (24), thirty-six (36), forty-eight (48), sixty (60), seventy-two (72), eighty-four (84), ninety-six (96), one hundred-eight (108), or one hundred-twenty (120) months by noting same on the Option 3 Check at the time of the Advance (the "Option 3 Repayment Term"). If Borrower does not specify a repayment term on the Option 3 Check, or if Lender is unable to determine the repayment term selected, the Option 3 Repayment Term for each such Advance shall be one hundred-twenty (120) months. The **ANNUAL PERCENTAGE RATE** on Advances made under this Option shall be fixed at the time the Advance is posted to the Account, as more fully described herein in the Section entitled "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE", for the full Option 3 Repayment Term. The minimum monthly payment amount shall be based upon the amount of the Advance, the **ANNUAL PERCENTAGE RATE**, and the Option 3 Repayment Term. Each Advance taken under this option shall be amortized over the Option 3 Repayment Term to establish the minimum monthly payment amount.

**Processing Fee.** When Borrower has chosen to repay an Advance under Option 3, a $15 fee shall be assessed to the Account for processing the Option 3 Advance.

### ANNUAL PERCENTAGE RATES AND PAYMENT TERMS DURING THE REPAYMENT PERIOD

The **ANNUAL PERCENTAGE RATE** for the Repayment Period for Option 1 and Option 2 Advances shall be fixed on the last day of the Draw Period based on *The Wall Street Journal* Prime Rate in effect on that day, plus the margin disclosed above for Option 1 and Option 2 Advances. The term during the Repayment Period for the full repayment of the outstanding Options 1 and 2 balances will be ten (10) years. The monthly payment amount for repayment of Options 1 and 2 will be established using a straight ten (10) year amortization and will be based upon the balances, the fixed interest rate and the ten (10) year term. All amounts of Options 1 and 2 Advance balances not paid as of the end of the Draw Period will be paid according to the terms applicable to the Repayment Period.

The **ANNUAL PERCENTAGE RATE**, the remaining term and the minimum monthly payment for the repayment of Option 3 Advances shall remain as determined by the Option 3 Repayment Term.

The minimum total monthly payment will be the sum of your Options 1, 2 and 3 minimum monthly payments, together with any applicable insurance premiums, debt cancellation or suspension charges, late charges, and/or miscellaneous fees dues. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions herein, will be due and payable at the end of the Repayment Period.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied as applicable to credit insurance, debt cancellation or suspension charges, then to any late charges and loan fees, then to any unpaid interest, and then to the balance of unpaid principal.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 8:00 a.m. Eastern Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to two (2) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Six Hundred Sixty Thousand & 00/100 Dollars ($660,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. We reserve the right to pay or return any requested Advance that exceeds your credit limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Security Deed or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Security Deed for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your property. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your property. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

> **Credit Line Checks.** Writing a preprinted "Access 3 Equity Line Check" that we will supply to you.

> **Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Access 3 Equity Line Checks in the following circumstances:

> **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Access 3 Equity Line Check.

> **Post-dated Checks.** Your Access 3 Equity Line Check is post-dated. If a post-dated Access 3 Equity Line Check is paid and as a result any other check is returned or not paid, we are not responsible.

> **Stolen Checks.** Your Access 3 Equity Line Checks have been reported lost or stolen.

> **Unauthorized Signatures.** Your Access 3 Equity Line Check is not signed by an "Authorized Signer" as defined below.

> **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Access 3 Equity Line Check.

> **Transaction Violation.** Your Access 3 Equity Line Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Access 3 Equity Line Check.

If we pay any Access 3 Equity Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Access 3 Equity Line Check. The Access 3 Equity Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Access 3 Equity Line Checks along with your periodic billing statements; however, your use of each Access 3 Equity Line Check will be reflected on your periodic statement as a credit advance. We do not "certify" Access 3 Equity Line Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

> **Credit Line Access 3 Equity Line Check and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Access 3 Equity Line Checks and requesting an advance in person.

**Authorized Signers.** The words "Authorized Signer" on Access 3 Equity Line Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Access 3 Equity Line Checks.** If you lose your Access 3 Equity Line Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (888) 461-8862. You also can notify us at Loan Servicing PO Box 85160, Richmond, VA 23286-9079.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage

Any areas where this is present represent redacted information.

Loan N

or Deed of Trust to a trustee to a trustee in favor of us, in real property located in RAPPAHANNOCK COUNTY, Commonwealth of Virginia. The Real Property or its address is commonly known as  64 GORDON CLAN LN, HUNTLY, VA  226403103.  The collateral must be your primary or secondary residence.

**Insurance.**  You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us.  You may obtain property insurance, and flood insurance if applicable, through any company of your choice that is reasonably satisfactory to us.  You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to your right, for reasonable cause before credit is extended, to decline any insurance provided by you.  Subject to applicable law, if you fail to obtain or maintain insurance as required in the Security Deed, we may purchase insurance to protect our own interest, but are not required to do so, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things. The insurance we purchase may be much more expensive and will, in most cases, provide less coverage than insurance you could buy.

**Right of Setoff.**  To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.**  If you have a credit or debit balance of more than $1.00, or if we have imposed a finance charge on your Credit Line Account, we will send you a Periodic Statement.  Bank will safekeep the paid Access 3 Checks.  Bank will make photocopies of Access 3 Checks and other instruments upon request.  (If such request is not made in connection with a billing error inquiry, it may be subject to Research and Photocopy charges as described below.)

Each Access 3 Check will be deemed to be an item for purposes of the Uniform Commercial Code ("UCC") of the state in which Bank is located and the time periods and other requirements for examining Periodic Statements and reporting improper entries will begin from the time Periodic Statements are sent or made available to Borrower.  Bank assumes no responsibility for entries included on Periodic Statements not received unless Borrower gives notice within sixty (60) days of the date on which the Periodic Statement is customarily mailed that it was not received.

The rules for stopping payment on Access 3 Checks shall be the same as the Bank's rules for stopping payment on checks written on deposit accounts.

The Periodic Statement will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance".  The Finance Charge ("Finance Charge") shall be the sum of the ATM Transaction Fee described herein and the Periodic Finance Charge ("Periodic Finance Charge").  A Periodic Finance Charge will be imposed on the Account and will be shown on the next Periodic Statement even if the New Balance was paid in full on or before the payment due date of the prior Periodic Statement.  Your Periodic Statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.**  Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line.  There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.**  A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on on  the Average Daily Balance.  For each Billing Cycle, the Periodic Finance Charge begins to accrue on Options 3 Check Advances on the day the Check is received by the Bank for payment and transaction.  Bank calculates the Periodic Finance Charge on Options 1 and 2 by applying the Daily Periodic Rate to the average daily balance.  To determine the "Daily Balance," take the beginning balance of each of the three (3) Options each day starting with the New Balance from the last Periodic Statement, plus all purchases, cash advances, Access 3 Checks, or any other Advances under each Option posted through that day, minus any unpaid Finance Charge, other charges, payments or other credits posted through that day.  The "Average Daily Balance" is the sum of:  the Daily Balance for each Option for the Billing Cycle divided by the actual number of days in the Billing Cycle.  The Periodic Finance Charge for each Option 3 Advance will be calculated by multiplying each Option 3 Average Daily Balance by the Daily Periodic Rate, multiplied by the number of days in the Billing Cycle.  The Periodic Finance Charge for the Account is the sum of the Periodic Finance Charges for the three (3) Options.

You also agree to pay FINANCE CHARGES, not calculated by applying a Periodic Rate, as set forth below:

**ATM Transaction Fee.**  You will be charged an Automated Teller Machine ("ATM") transaction fee of $5.00 when you obtain a credit advance at any of our designated ATM locations.

**Option 3 Processing Fee.**  When Borrower has chosen to repay an Advance under Option 3, a $15 fee shall be assessed to the Account for processing the Option 3 Advance.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.**  We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows.  For Options 1 and 2 Advances, we start with an independent index which is the Prime Rate.  The Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE for Options 1 and 2, for each Billing Cycle will depend upon the Prime Rate.  The "Prime Rate" means the per annum rate of interest published from time to time by *The Wall Street Journal* in its "Money Rates" listings, as the Prime Rate on the day preceding the first day of the Billing Cycle.  In the event that on any particular day *The Wall Street Journal* publishes more than one Prime Rate, for purposes of this Agreement, the Prime Rate shall mean the highest Prime Rate so published.  The ANNUAL PERCENTAGE RATE for each Option 3 Advance shall be determined according to the applicable Weekly Interest Rate Swap Index in effect on the day preceding the first day of the Billing Cycle in which each such Advance is taken.  The Daily Periodic Rate for Option 3 for each Billing Cycle will depend upon the Option 3 Repayment Term.  If the Option 3 Repayment Term is sixty (60) months or less, the rate is determined at the time of the draw using the 3-year Interest Rate Swap Index +3.250%.  In the event of an Option 3 Repayment Term of seventy-two (72) months or more the rate is determined at the time of draw using the 5-year Interest Rate Swap Index +3.250%.  The current values of both indices are published weekly by the Federal Reserve Board in Statistical Release H. 15(619) and on the Federal Reserve's web page at www.federalreserve.gov/releases/h15.  The number of days in the Billing Cycle and the statement closing date will be shown on each Periodic Statement.  For example, if the statement closing date is September 1st and there are thirty (30) days in the Billing Cycle, to calculate the first day in the Billing Cycle, subtract thirty (30) days from September 1st, to arrive at August 2nd.  This Billing Cycle would begin August 2nd and end September 1st.  So if the first day of the Billing Cycle is August 2nd, the corresponding ANNUAL PERCENTAGE RATE for that Billing Cycle will equal the Prime Rate in effect on August 1st, plus or minus the margin.  The Daily Periodic Rate equals the Prime Rate plus or minus the margin divided by actual number of days in the year.  For Options 1 and 2 Advances, the Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE may increase or decrease according to increases or decreases in the Prime Rate.  In the Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE increase, the Periodic Finance Charge and Minimum Payment may increase during the Draw Period.  The increases and decreases caused by changes in the Prime Rate will take effect on the first day of each succeeding Billing Cycle and will remain in effect for the entire Billing Cycle.  For Options 1 and 2, the current Daily Periodic Rate is 0.02123% and the corresponding ANNUAL PERCENTAGE RATE is 7.75000%.  These rates are based upon the Prime Rate of 7.75000% which was in effect as of 04-18-2006.  For Option 3 Advances with an Option 3 Repayment Term of sixty (60) months or less, the current Daily Periodic Rate is 0.02315% and the corresponding ANNUAL PERCENTAGE RATE is 8.45000%.  These rates are based upon the 3-year Interest Rate Swap Index of 5.20000% which was in effect as of 04-18-2006.  For Option 3 Advances with an Option 3 Repayment Term of seventy-two (72) months or more, the current Daily Periodic Rate is 0.02326% and the corresponding ANNUAL PERCENTAGE RATE is 8.49000%.  These rates are based upon the 5-year Interest Rate Swap Index of 5.24000% which was in effect as of 04-18-2006.  Because these rates can change, the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE applicable to the first and subsequent Billing Cycles of the Account may differ from the disclosure above.  The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will not change during the course of any one Billing Cycle.  The ANNUAL PERCENTAGE RATE does not include costs other than interest.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**Negative Amortization.**  Under some circumstances, your payments will not cover the finance charges that accrue and negative amortization will occur.  Negative amortization will increase the amount that you owe us and reduce your equity in your home.

**Conditions Under Which Other Charges May Be Imposed.**  You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Returned Items.**  You may be charged $30.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Fee to Stop Payment.**  Your Credit Line Account may be charged $30.00 when you request a stop payment on your account.

**Overlimit Charge.**  Your Credit Line Account may be charged $25.00 if you cause your Credit Line Account to go over your Credit Limit.  This includes writing a Access 3 Equity Line Check in excess of your available balance.

**Charge for Advance Less than Minimum.**  Your Credit Line Account may be charged $25.00 if you obtain a credit advance for less than the

Any areas where this is present represent redacted information.

minimum advance amount disclosed above, whether we decide to honor it or whether we refuse to honor it, unless applicable law requires a lower charge or prohibits any charge.

**Miscellaneous Photocopying.** If you request a copy of any document, we may charge your Credit Line Account $5.00 per check copy, $5.00 per statement copy and $25.00 per hour of extensive research time for the time it takes us to locate, copy, and mail the document to you. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.

**Late Charge.** Your payment will be late if it is not received by us within 7 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the payment.

**Closing Costs.** You agree to pay us the settlement charges ("Closing Costs") set forth below in connection with this Account, to include but not be limited to, costs or fees for the preparation, execution, and recording of the Security Instrument securing this Account. In addition, if allowed by applicable law, you agree to pay the cost of recording the release or satisfaction of the Security Instrument which shall be added to the payoff.

| | |
|---|---|
| **RECORDING FEE | $1,397.30 |
| TITLE INS | $1,570.00 |
| **FLD DETERM /EFL | $3.10 |
| TITLE SCH /ILS | $150.00 |
| **APPRAISAL /ILS | $650.00 |

We may agree to advance some or all of the Closing Costs on your behalf at, before or after the time of settlement; however, you shall reimburse us for the Closing Costs advanced by us on your behalf if you pay the Account Balance in full and close the Account within three (3) years of opening the Account. In such event, we may add this amount to your Account Balance at the time of payoff, or if requested you will pay us directly upon demand. A double asterisk (**) before the fee description indicates that the Closing Cost was paid by the Bank, and subject to reimbursement as described herein. Accordingly, you agree to reimburse us in the amount of $2,050.40 if you pay the Account Balance in full and close the Account within three (3) years of opening the Account, and that such amount shall be solely a reimbursement and not a penalty.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of any person liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, the use of funds or the dwelling for prohibited purposes, or if title to the property is taken through eminent domain. These are each considered events of default.

**Default Remedies.** Upon default, we may exercise any and all rights contained in this Agreement, the Security Instrument or any other rights provided to us by law or equity, including but not limited to, the right to sell the Real Property at a public auction or as provided by law. We may waive or decline to enforce any of our rights under this Agreement at any time without affecting any of our other rights under this Agreement. Furthermore, upon default, your authorization to initiate Advances on the Account shall terminate and we may return any Access 3 Checks unpaid or decline Access 3 Credit Card charges or cash advances, without liability to you and without prior notification.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

(7) We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

If we temporarily prohibit additional advances on the account and/or reduce the Credit Limit based upon any of the foregoing situations, we will provide you with written notice of said action after action is taken. The notice will explain how you can request reinstatement of credit privileges, if applicable.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the index is no longer available, we will choose a new index and margin. The new index will have an historical movement substantially similar to the original index, and the new index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original index becomes unavailable.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees or reasonable attorneys' fees as allowed by law, if any sums owing under this Agreement are collected by or through an attorney at law, whether or not there is a lawsuit, and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Access 3 Equity Line Checks and any other access devices. Any use of Access 3 Equity Line Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Access 3 Equity Line Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation, Termination or Suspension by You.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement (except for our obligation to make advances).

Your Account will automatically terminate on the earlier of Maturity or on the date we give you notice of the termination as the result of an

Any areas where this is present represent redacted information.


occurrence of a default (as described herein). Upon termination of the Account, the entire Account balance then outstanding, with accrued interest and any fees and charges owing on the Account, will be due and payable in full on that date. Further you can terminate or suspend this Agreement by written notice, signed by you, and a request for a discharge of the Security Instrument, also signed by you, mailed or delivered to us at any time. In such event, your notice of termination will be effective on the first business day after we receive your written request to terminate or suspend, and provided that no further information or action is required to so terminate or suspend; and further in such event of termination the entire principal balance outstanding on your Account, plus interest accrued thereon, together with fees and charges owing on the Account, will be due and payable in full on that date, at our sole option. We shall terminate your Account or suspend Advance privileges upon our receipt of your written instructions of all Borrowers as described above; additionally, you agree and hereby authorize us that we may, but are not required to, terminate or suspend Advance privileges on your Account upon written request of any one of you. We may require a notarized writing before terminating the Account. In the event any Borrower terminates, suspends or cancels the Account, whether completely or only as to future Advances, you agree that you shall be jointly and severally liable to us as governed by the other provisions of this Agreement in the event any Borrower obtains an Advance before or after any suspension, cancellation or termination by any party.

We may at our option allow you to continue to make regular monthly payments or to restructure the amount owed in a mutually agreeable manner, or may require you to pay the entire unpaid balance in full.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: SunTrust Bank, P.O. Box 27161 Richmond, VA 23261-7161.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly of any change in your mailing address, any change in financial condition, or of any unauthorized use of the Account. As a material obligation under this Agreement, you will update the information and furnish us with additional financial aid or other information as we may request. You will immediately telephone us and confirm by letter if any Access 3 Checks or the Access 3 Credit Card are lost or stolen, and upon failure to do so, you will assume full responsibility if we should, without negligence, pay such Access 3 Checks. At the time of this Agreement, the telephone number for reporting lost or stolen checks is (888) 461-8962. Your liability for the unauthorized use of the Access 3 Credit Card shall not exceed the lesser of $50.00 or the amount of money, property, labor or services obtained by the unauthorized use of the Access 3 Credit Card prior to the time you notify us of the loss or theft of the card. We shall not be responsible to you in any manner if anyone refuses to accept an Access 3 Check as a manner of payment.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the mortgage or deed of trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Homestead Waiver.** You, to the extent permitted by law, hereby waive your homestead exemption with respect to all property subject to any security interest or lien granted to secure this loan.

**Jury Waiver.** We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**INFORMATION REPORTED TO CREDIT BUREAUS. UNDER THE FAIR CREDIT REPORTING ACT, YOU HAVE THE RIGHT TO NOTIFY US IF YOU BELIEVE WE HAVE REPORTED INACCURATE INFORMATION ABOUT YOUR ACCOUNT TO A CREDIT BUREAU OR CONSUMER REPORTING AGENCY. SUCH NOTICES SHOULD BE SENT IN WRITING AND INCLUDE YOUR COMPLETE NAME, CURRENT ADDRESS, SOCIAL SECURITY NUMBER, TELEPHONE NUMBER, ACCOUNT NUMBER, TYPE OF ACCOUNT, SPECIFIC ITEM OF DISPUTE AND THE REASON WHY YOU BELIEVE THE INFORMATION REPORTED IS IN ERROR. SEND YOUR NOTICE TO: SUNTRUST BANK, P.O. BOX 85052, RICHMOND, VA 23285-5052.**

**Arbitration Clause.** Upon the demand of either party hereto, any action, claim, dispute, or controversy arising from or relating to this agreement or the relationships which result from this agreement (hereinafter "Claim" or "Claims"), including Claims by either party against the employees, officers, directors, agents, successors, heirs, or assigns of the other party, including Claims regarding the applicability, interpretation, or validity of this arbitration clause and/or the underlying agreement, shall be resolved by individual (not class or class-wide) binding arbitration, except as specifically provided herein. The individual arbitration proceedings shall be governed by the rules, procedures and fees of the National Arbitration Forum or the American Arbitration Association in effect at the time the Claim is made or filed. Borrower has the right to select which of these arbitration forums to use, but if Borrower does not make a timely selection, Lender may make the choice. Any arbitration hearing will take place at a location reasonably convenient to Borrower. At Borrower's written request, Lender or the holder of the promissory note or this agreement will advance any arbitration filing fee or administrative and hearing fees which Borrower is required to pay to pursue a Claim subject to the arbitrator ultimately deciding who must be responsible for paying those fees. In no event will Borrower be required to reimburse Lender or the holder of the promissory note or this agreement for any filing, administrative or hearing fees in an amount greater than what the costs would have been had the Claim been resolved in a court with jurisdiction. The parties agree that the arbitrator shall have all powers provided by law and this agreement. These powers include all legal and equitable remedies, including but not limited to the power to decide money damages and issue declaratory or injunctive relief. Judgment upon an arbitration award may be entered in any court having jurisdiction. A demand for arbitration may be made before or after the beginning of any legal proceeding; however, any demand made after the initiation of a legal proceeding must be made within sixty (60) days following the service of a complaint, third-party complaint, cross-claim, or counterclaim.

The parties acknowledge and agree that this agreement to arbitrate is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT OR OPPORTUNITY TO INDIVIDUALLY, OR AS PART OF A CLASS ACTION, LITIGATE CLAIMS IN COURT REGARDING THIS AGREEMENT OR THIS ARBITRATION CLAUSE AND CHOOSE INDIVIDUAL (NOT CLASS) BINDING ARBITRATION TO RESOLVE ALL CLAIMS AND SHALL INCLUDE NO OTHER (EVEN IDENTICAL) DISPUTE WITH ANOTHER CUSTOMER OR BORROWER, EXCEPT AS SPECIFICALLY PROVIDED HEREIN.

This arbitration agreement, unless prohibited by applicable law, applies to all Claims specified above, whether now in existence or arising in the future and shall survive the voluntary payment of debt in full, any bankruptcy, or sale of the debt, EXCEPT nothing in this arbitration agreement shall be construed to prevent either party from using self-help repossession, replevin, judicial or non-judicial foreclosure or any other form of relief allowed by law to enforce a security interest. The institution and maintenance of such litigation shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration pursuant to this arbitration agreement.

**Governing Law.** This Agreement shall be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the Commonwealth of Virginia without regard to its conflicts of law provisions. This Agreement has been accepted by us in the Commonwealth of Virginia.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the mortgage or deed of trust, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the mortgage or deed of trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic

Any areas where this is present represent redacted information.

statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

This Agreement is dated April 18, 2006.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X ~~Sheila A Rekow~~ (Seal)     X ~~Marlin F Rekow~~ (Seal)
SHEILA A REKOW                   MARLIN F REKOW

Any areas where this is present represent redacted information.

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> SunTrust Bank
> Credit Line
> P.O. Box 85160
> Richmond, VA 23285-5160

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

> Your name and account number.

> The dollar amount of the suspected error.

> Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rules for Credit Card Purchases**

If you have a problem with the quality of property or services that you purchased with a credit card, and have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or service. There are two limitations on this right:

(a)     You must have made the purchase in your home state or, if not within your home state, within one hundred (100) miles of your current mailing address; and

(b)     The purchase price must have been more than $50.00.

The limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

LASER PRO Lending, Ver. 5.38.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - VA I:\LPRO\CFI\LPL\D28.FC TR-500022 PR-ACCN

**Any areas where this is present represent redacted information.**

||||| ||||| ||| ||||| |||| ||| ||||| ||||| |||| ||||| ||| |||||

# RENEWAL AND CREDIT LIMIT INCREASE ADDENDUM TO ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $660,000.00 | 04-18-2006 | 04-18-2026 | *** | | | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing ***** has been omitted due to text length limitations.

| Borrower: | SHEILA A REKOW<br>MARLIN F REKOW<br>64 GORDON CLAN LN<br>HUNTLY, VA 226403103 | Lender: | SunTrust Bank<br>CLSC - Richmond<br>1001 Semmes Ave<br>Richmond, VA 23224 |
|-----------|---|---|---|

NEW CREDIT LIMIT: $680,000.00 _____

DATE: 4-18-2006 _____

This is an addendum (this "Addendum") by and between Borrower and SunTrust Bank to that certain Access 3 Equity Line Account Agreement and Disclosure Statement executed by Borrower in favor of SunTrust Bank of even date herewith (the "Renewal Agreement"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Renewal Agreement.

Borrower has read, acknowledges, understands and agrees to and with each and all of the following:

1. The Renewal Agreement is a renewal of and Credit Limit increase to that certain Access 3 Equity Line Account Agreement and Disclosure Statement originally entered into by and between Borrower and SunTrust Bank on 4-6-2005 _____ (the "Original Agreement"), and is not nor is it intended by the parties to be a novation of the obligations under the Original Agreement;

2. The Draw Period and the Repayment Period of the Original Agreement are each renewed and/or extended under the Renewal Agreement as outlined therein, and said new and renewed Draw and Repayment Periods shall become effective immediately upon closing of the Renewal Agreement and related loan documents;

3. As to Advance balances currently outstanding under Option 1 and Option 2, the Annual Percentage Rate shall be calculated at the rate(s) and be repaid according to the term, provisions and conditions as contained within the Renewal Agreement, including but not limited to the renewed and/or extended Draw and Repayment Periods. Balances currently outstanding as to Advances taken under Option 3 shall continue to be repaid in accordance with the interest rate and term originally assigned to each such Advance at the time each such Advance was taken;

4. Future Advances under each and any Option shall be treated in accordance with the provisions of the Renewal Agreement;

5. The Maturity Date of the Original Agreement and Security Instrument shall be extended as outlined in the Renewal Agreement and any modification to the Security Instrument;

6. Repayment of indebtedness incurred under the Original Agreement and the Renewal Agreement shall continue to be secured by the Security Instrument on the Property more fully described in the Original Agreement, Renewal Agreement and/or Security Instrument.

BORROWER:

_____   Name:
MARLIN F REKOW

_____   Name:
SHEILA A REKOW

_____   Name:

_____   Name:

LASER PRO Lending, Ver. 5.28.00.104 Copr. Harland Financial Solutions, Inc. 1997, 2006. All Rights Reserved. - VA ���ProfExt/PLUGRJ/C 3P-560633 PR-ACCN



Any areas where this is present represent redacted information.

06-959-1

REKOW, SHEILA A
Nashville, TN ~~~

WHEN RECORDED MAIL TO: 5/18/06

Record and Return To:
United General Title Ins
Fiserv-600A N.JohnRodes Blvd
Melbourne, FL 32934

---

Tax Map Reference No(s): 5-1-16H          **FOR RECORDER'S USE ONLY**

---

This Modification of Deed of Trust prepared by: SunTrust Bank██████████████Loan
Document Specialist, SunTrust Bank

### ☀ SUNTRUST·

## MODIFICATION OF DEED OF TRUST



THIS MODIFICATION OF DEED OF TRUST dated April 18, 2006, is made and executed between
between SHEILA A <u>REKOW</u>, whose address is 64 GORDON CLAN LN, HUNTLY, VA 226403103 and
MARLIN F <u>REKOW</u>, whose address is 64 GORDON CLAN LN, HUNTLY, VA 226403103 ("Grantor")
and SunTrust Bank, whose address is CLSC - Richmond, 1001 Semmes Ave, Richmond, VA 23224
("Lender").

**DEED OF TRUST.** Grantor executed and delivered to Trustee a Deed of Trust dated April 6, 2005 (the
"Deed of Trust") recorded MAY 9, 2005 in INSTRUMENT NUMBER 050000881 in the Clerk's Office of
COUNTY RAPPAHANOCK, VIRGINIA,

The maximum aggregate amount of principal to be secured at any one time is increased from TWO
HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) to SIX HUNDRED SIXTY THOUSAND
DOLLARS ($660,000.00). And as of APRIL 18, 2006, the unpaid rincipal balance was $227,032.78.
with respect to certain real property more particularly described in the Deed of Trust and commonly
known as Real Property located at 64 GORDON CLAN LN, HUNTLY, VA 226403103. The Deed of
Trust provides that any Trustee may act alone to exercise all the rights and powers of any other
Trustee.

**MODIFICATION.** Lender and Grantor hereby modify the Deed of Trust as follows:

("**XX**" Represents applicable modifications to above referenced mortgage)

\_\_\_\_\_ WHEREAS, the Agreement and Security Instrument have or are about to mature and the
Borrower has requested an extension of the time for payment;

\_\_XX\_\_ WHEREAS, Borrower has requested an increase in the amount of the credit line and Bank
has agreed to increase the credit limit, on the terms and conditions set forth herein; and .

\_\_XX\_\_ The Bank hereby agrees to extend the time for payment of the Agreement and Security
Instrument and Borrower agrees to pay same and any advances made pursuant to the Access 3 line
of credit as set forth in the Renewal Agreement, executed by Borrower on the date hereof, in the
amount of the unpaid principal balance of the Agreement, plus accrued interest, costs, and
expenses, with a maturity date of \_\_APRIL 18, 2026\_\_\_\_\_. No new monies have been advanced
unless the box below is checked.

\_\_XX\_\_ In order to evidence an increase in the credit line as contained in the Agreement, as
contemplated hereby, the Renewal Agreement and the Security Instrument are hereby amended to
provide for an increase in the credit limit in the amount of

Any areas where this is present
represent redacted information.

**EXHIBIT**

*C*

ALL-STATE LEGAL®

$ $410,000.00 .

**CONTINUING VALIDITY.** Except as expressly modified above, the terms of the original Deed of Trust shall remain unchanged and in full force and effect. Consent by Lender to this Modification does not waive Lender's right to require strict performance of the Deed of Trust as changed above nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction of the promissory note or other credit agreement secured by the Deed of Trust (the "Note"). It is the intention of Lender to retain as liable all parties to the Deed of Trust and all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification. If any person who signed the original Deed of Trust does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension or modification, but also to all such subsequent actions. Grantor hereby ratifies and affirms that Grantor's liability shall continue in full force and effect through and including the Note's now extended maturity date and that Grantor has no defenses, setoffs, or other claims against Lender arising out of this credit facility. If it is determined that any other person or entity other than Lender shall have a lien, encumbrance, or claim of any type which has a legal priority over any term of this Modification, the original terms of the Note and Mortgage shall be severable from this Modification and separately enforceable from the terms thereof as modified hereby in accordance with their original terms, and Lender shall maintain all legal or equitable priorities which were in existence before the date of execution of this Modification. It is understood by and is the intention of the parties hereto that any legal or equitable priorities of Lender over any party which were in existence before the date of execution of this Modification shall remain in effect after the execution of this Modification.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF DEED OF TRUST AND GRANTOR AGREES TO ITS TERMS. THIS MODIFICATION OF DEED OF TRUST IS DATED APRIL 18, 2006.**

**THIS MODIFICATION IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MODIFICATION IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**GRANTOR:**

X _____ (Seal)
SHEILA A REKOW

X _____ (Seal)
MARLIN F REKOW

**LENDER:**

SUNTRUST BANK

X _____ (Seal)
Authorized Officer

Any areas where this is present represent redacted information.

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Virginia_ )
) SS
COUNTY OF _Prince William_ )

On this day before me, the undersigned Notary Public, personally appeared **SHEILA A REKOW**, to me known to be the individual described in and who executed the Modification of Deed of Trust, and acknowledged that he or she signed the Modification as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _18_ day of _April_, 20_06_.

By _Barbara F. Fuller_ Residing at _8751 Sudley Rd_
_Manassas Va 20110_
Notary Public in and for _Virginia_ My commission expires _06/30/2007_

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Virginia_ )
) SS
COUNTY OF _Prince William_ )

On this day before me, the undersigned Notary Public, personally appeared **MARLIN F REKOW**, to me known to be the individual described in and who executed the Modification of Deed of Trust, and acknowledged that he or she signed the Modification as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _18_ day of _April_, 20_06_

By _Barbara F. Fuller_ Residing at _8751 Sudley Rd_
_Manassas, Va 20110_
Notary Public in and for _Virginia_ My commission expires _06/30/2007_

Any areas where this is present represent redacted information.

**LENDER ACKNOWLEDGMENT**

STATE OF _Tennessee_ )
                                                    ) SS
COUNTY OF _Davidson_ )

On this _2nd_ day of _May_ , 20 _06_ , before me, the undersigned Notary Public, personally appeared _Diana Bass_ and known to me to be the _Audit Officer_ , authorized agent for the Lender that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of the said Lender, duly authorized by the Lender through its board of directors or otherwise, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this said instrument and that the seal affixed is the corporate seal of said Lender.

By _Nora K Sullivan_                          Residing at _____

Notary Public in and for _____        My commission expires _____

LASER PRO Lending, Ver. 5.30.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2006. All Rights Reserved. - VA  H:\LPRO\CFI\LPL\G202.FC  TR-560632  PR-AGCN

_(seal: NORA K. SULLIVAN, STATE OF TENNESSEE, NOTARY PUBLIC, DAVIDSON COUNTY. My Commission Expires JAN. 23, 2010)_

**Any areas where this is present represent redacted information.**

FileNo : G0335604

## Schedule A

ALL THE FOLLOWING DESCRIBED TRACT OR PARCEL OF LAND (TAX MAP 5 (1) PARCEL 16H, TOGETHER WITH BUILDINGS AND IMPROVEMENTS THEREON AND PRIVILEGES AND APPURTENANCES THEREWITH CONNECTED, SITUATE, LYING AND BEING IN WAKEFIELD DISTRICT, RAPPAHANNOCK;COUNTY, VIRGINIA, TO-WIT:

THE LAND BEING REFERRED TO IN THIS COMMITMENT IS DESCRIBED AS FOLLOWS:

PARCEL 1B1, CONTAINING 30.4502 ACRES AS SHOWN ON BOUNDARY ADJUSTMENT PLAT RECORDED JULY 12, 1999 AS LR #990001262, AMONG THE LAND RECORDS OF RAPPAHANNOCK COUNTY, VIRGINIA.

INSTRUMENT #060000959
RECORDED IN THE CLERK'S OFFICE OF
COUNTY OF RAPPAHANNOCK ON
MAY 18, 2006 AT 09:54AM
DIANE BRUCE, CLERK

RECORDED BY: LWW

050520426499

05-881-1

PIN: 5-1-16H

WHEN RECORDED MAIL TO:

REKOW, MARLIN F

Record and Return To:
Integrated Loan Services
600-A N John Rodes Blvd.
Melbourne, FL 32934

Nashville, TN 37230-5053      5/9

FOR RECORDER'S USE ONLY

879.33

This Deed of Trust prepared by:   SunTrust B████████████an Document Specialist, SunTrust Bank

## SunTrust

QC

DEED OF TRUST

### THIS IS A CREDIT LINE DEED OF TRUST

**Maximum aggregate amount of principal
to be secured hereby at any one time: $250,000.00**

### Name and address of Noteholder secured hereby:

**SunTrust Bank
CLSC - Richmond
1001 Semmes Ave
Richmond, VA  23224**

THIS DEED OF TRUST is dated April 6, 2005, among MARLIN F REKOW, whose address is 64 GORDON CLAN LN, HUNTLY, VA  226403103 and SHEILA A REKOW, whose address is 64 GORDON CLAN LN, HUNTLY, VA  226403103 ("Grantor"); SunTrust Bank, whose address is CLSC - Richmond, 1001 Semmes Ave, Richmond, VA  23224 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and CECIL STONE, a resident of Virginia, whose address is 1001 Semmes Avenue, Richmond, VA  23224 and SHELIA THOMPSON, a resident of Virginia, whose address is 1001 Semmes Avenue, Richmond, VA  23224 ("Grantee," also referred to below as "Trustee"), either of whom may act.

CONVEYANCE AND GRANT.  For valuable consideration, Grantor conveys, transfers, encumbers and pledges and assigns to Trustee for the benefit of Lender as Beneficiary, all of Grantor's present and future right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; and all rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in RAPPAHANNOCK COUNTY, Commonwealth of Virginia:

See the exhibit or other description document which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as  64 GORDON CLAN LN, HUNTLY, VA 226403103.

REVOLVING LINE OF CREDIT.  This Deed of Trust secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement.  Such advances may be made, repaid, and



Any areas where this is present
represent redacted information.

EXHIBIT
D
ALL-STATE LEGAL®

remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement. any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Deed of Trust secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Deed of Trust and any intermediate balance.

**FUTURE ADVANCES.** In addition to the amounts specified in the Credit Agreement, this Deed of Trust also secures future advances.

Grantor presently, absolutely, and irrevocably assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Grantor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Grantor's obligations under the Credit Agreement, this Deed of Trust, and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

    **Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) acting as Lender's agent, collect the Rents from the Property.

    **Duty to Maintain.** Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

    **Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.



Any areas where this is present represent redacted information.


Without otherwise limiting Grantor's covenants as provided herein, Grantor shall not without Lender's prior written consent, remove or permit the removal of sand, gravel or topsoil, or engage in borrow pit operations, or use or permit the use of the Property as a land fill or dump, or store, burn or bury or permit the storage, burning or burying of any material or product which may result in contamination of the Property or the groundwater or which may require the issuance of a permit by the Environmental Protection Agency or any state or local government agency governing the issuance of hazardous or toxic waste permits, or request or permit a change in zoning or land use classification, or cut or remove or suffer the cutting or removal of any trees or timber from the Property.

At its sole cost and expense, Grantor shall comply with and shall cause all occupants of the Property to comply with all Environmental Laws with respect to the disposal of industrial refuse or waste, and/or the discharge, processing, manufacture, generation, treatment, removal, transportation, storage and handling of Hazardous Substances, and pay immediately when due the cost of removal of any such wastes or substances from, and keep the Property free of any lien imposed pursuant to such laws, rules, regulations and orders.

Grantor shall not install or permit to be installed in or on the Property, friable asbestos or any substance containing asbestos and deemed hazardous by federal, state or local laws, rules, regulations or orders respecting such material. Grantor shall further not install or permit the installation of any machinery, equipment or fixtures containing polychlorinated biphemyls (PCBs) on or in the Property. With respect to any such material or materials currently present in or on the Property, Grantor shall promptly comply with all applicable Environmental Laws regarding the safe removal thereof, at Grantor's expense.

Grantor shall indemnify Lender and hold Lender harmless from and against all loss, cost, damage and expense (including, without limitation, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Lender may incur as a result of or in connection with the assertion against Lender of any claim relating to the presence or removal of any Hazardous Substance, or compliance with any Environmental Law. No notice from any governmental body has ever been served upon Grantor or, to Grantor's knowledge after due inquiry, upon any prior owner of the Property, claiming a violation of or under any Environmental Law or concerning the environmental state, condition or quality of the Property, or the use thereof, or requiring or calling attention to the need for any work, repairs, construction, removal, cleanup, alterations, demolition, renovation or installation on, or in connection with, the Property in order to comply with any Environmental Law; and upon receipt of any such notice, Grantor shall take any and all steps, and shall perform any and all actions necessary or appropriate to comply with the same, at Grantor's expense. In the event Grantor fails to do so, Lender may declare this Deed of Trust to be in default.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** NOTICE - THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF

Any areas where this is present represent redacted information.


THE PROPERTY CONVEYED. Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Virginia law.

TAXES AND LIENS. The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

Payment. Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

Right to Contest. Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

Evidence of Payment. Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

Notice of Construction. Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

PROPERTY DAMAGE INSURANCE. The following provisions relating to insuring the Property are a part of this Deed of Trust.

Maintenance of Insurance. Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender, together with such other hazard and liability insurance as Lender may require. Policies shall be written in form, amounts, coverages and basis acceptable to Lender and issued by a company or companies acceptable to Lender. All policies shall provide that the policies shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

Application of Proceeds. Grantor shall promptly notify Lender of any loss or damage to the



Any areas where this is present represent redacted information.

Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Deed of Trust at any trustee's sale or other sale held under the provisions of this Deed of Trust, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Deed of Trust also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants generally that: (a) Grantor holds good and marketable title to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature



Any areas where this is present represent redacted information.


and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to the lien securing payment of an existing obligation. The existing obligation has a current principal balance of approximately $555289.00. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Notice of Proceedings.** Grantor shall immediately notify Lender in writing should all or any part of the Property become subject to any condemnation or expropriation proceedings or other similar proceedings, including without limitation, any condemnation, confiscation, eminent domain, inverse condemnation or temporary requisition or taking of the mortgaged Property, or any part or parts of the Property. Grantor further agrees to promptly take such steps as may be necessary and proper within Lender's sole judgment and at Grantor's expense, to defend any such condemnation or expropriation proceedings and obtain the proceeds derived from such proceedings. Grantor shall not agree to any settlement or compromise or any condemnation or expropriation claim without Lender's prior written consent.

**Lender's Participation.** Lender may, at Lender's sole option, elect to participate in any such condemnation or expropriation proceedings and be represented by counsel of Lender's choice. Grantor agrees to provide Lender with such documentation as Lender may request to permit Lender to so participate and to reimburse Lender for Lender's costs associated with Lender's participation, including Lender's reasonable attorneys' fees.

**Conduct of Proceedings.** If Grantor fails to defend any such condemnation or expropriation proceedings to Lender's satisfaction, Lender may undertake the defense of such a proceeding for and on behalf of Grantor. To this end, Grantor irrevocably appoints Lender as Grantor's agent and attorney-in-fact, such agency being coupled with an interest, to bring, defend, adjudicate, settle, or otherwise compromise such condemnation or expropriation claims; it being understood, however, that, unless one or more Events of Default (other than the condemnation or expropriation of the Property) then exists under this Deed of Trust, Lender will not agree to any final settlement or compromise of any such condemnation or expropriation claim without Grantor's prior approval, which approval shall not be unreasonably withheld.

**Application of Net Proceeds.** Lender shall have the right to receive all proceeds derived or to be derived from the condemnation, expropriation, confiscation, eminent domain, inverse condemnation, or any permanent or temporary requisition or taking of the Property, or any part or parts of the Property ("condemnation proceeds"). In the event that Grantor should receive any such condemnation proceeds, Grantor agrees to immediately turn over and to pay such proceeds to Lender. All condemnation proceeds, which are received by, or which are payable to either Grantor or Lender, shall be applied, at Lender's sole option and discretion, and in such manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or incurred by Grantor and/or Lender), for the purpose of: (a) replacing or restoring the condemned, expropriated, confiscated, or taken Property; or (b) reducing the then outstanding balance of the Indebtedness, together with interest thereon, with such payments being applied in the manner provided in this Deed of Trust. Lender's receipt of such condemnation proceeds and the application of such proceeds as provided in this Deed of Trust shall not affect the lien of this Deed of Trust.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

Any areas where this is present represent redacted information.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place convenient to Lender and make it available to Lender promptly following Lender's request to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Grantor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Any reconveyance fee required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Grantor will be in default under this Deed of Trust if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the


Any areas where this is present represent redacted information.

collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Deed of Trust, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable. This right is in addition to all other rights given to holders of promissory notes under Title 55 of the Code of Virginia.

**Foreclosure.** With respect to all or any part of the Real Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law. Grantor expressly waives and releases any requirement or obligation that Lender or Trustee present evidence or otherwise proceed before any court or other judicial or quasi-judicial body as a precondition to or otherwise incident to the exercise of the powers of sale authorized by this Credit Line Deed of Trust. The proceeds of sale shall be applied by Trustee as follows: (a) first, to pay all proper advertising expenses, auctioneer's allowance, the expenses, if any, required to correct any irregularity in the title, premium for Trustee's bond, auditor's fee, attorneys' fees, and all other expenses of sale incurred in or about the protection and execution of this Deed of Trust, and all moneys advanced for taxes, assessments, insurance, and with interest thereon at the rate provided in the Credit Agreement, and all taxes and assessments due upon the Property at time of sale, and to retain as compensation a reasonable Trustee's commission; (b) second, to pay the whole amount then remaining unpaid on the Indebtedness; (c) third, to pay liens of record against the Property according to their priority of lien and to the extent that funds remaining in Trustee's hands are available; and (d) last, to pay the remainder of the proceeds, if any, to Grantor, Grantor's heirs, personal representatives, successors or assigns upon the delivery and surrender to the purchaser of possession of the Property, less costs and expenses of obtaining possession.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Credit Agreement or by law.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale



Any areas where this is present represent redacted information.

of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least fourteen (14) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees equal to 25.000% of the principal balance due on the Indebtedness at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees equal to 25.000% of the principal balance due on the Indebtedness and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees equal to 25.000% of the principal balance due on the Indebtedness and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, a reasonable Trustee's commission and reasonable attorney fees incurred by the Trustee in performing its duties under the Deed of Trust, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee (and each of them if more than one) shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Grantor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender will have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, at any time hereafter and without prior notice and without specifying any reason, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office in the jurisdiction where this Deed of Trust has been recorded. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Grantor, the book and page where this Deed of Trust is recorded, and the name of the successor trustee and the county, city or town in which he or she resides, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Power to Act Separately.** If more than one Trustee is named in this Deed of Trust, any Trustee may act alone, without the joinder of any other Trustee, to exercise any or all the powers given to the Trustees collectively in this Deed of Trust or by applicable law.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually


Any areas where this is present represent redacted information.

delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any person may change his or her address for notices under this Deed of Trust by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**LOSS OF PRIORITY AS TO FUTURE ADVANCES.** If you request a modification of the Security Instrument or if a judgment lien or other lien is placed against the Property with the result in either case that our security interest in the Property loses priority as to future advances over subsequently recorded deeds of trust, or other liens, we shall have the right to suspend additional extensions of credit or reduce your credit limit as well as the right to exercise our other rights under this agreement.

**MATURITY DATE.** The maturity date of the obligations secured by this Security Instrument is 20 years from the date of this Security Instrument, as first stated above.

**ARBITRATION CLAUSE.** Upon the demand of either party hereto, any action, claim, dispute, or controversy arising from or relating to this agreement or the relationships which result from this agreement (hereinafter "Claim" or "Claims"), including Claims by either party against the employees, officers, directors, agents, successors, heirs, or assigns of the other party, including Claims regarding the applicability, interpretation, or validity of this arbitration clause and/or the underlying agreement, shall be resolved by individual (not class or class-wide) binding arbitration, except as specifically provided herein. The individual arbitration proceedings shall be governed by the rules, procedures and fees of the National Arbitration Forum or the American Arbitration Association in effect at the time the Claim is made or filed. Borrower has the right to select which of these arbitration forums to use, but if Borrower does not make a timely selection, Lender may make the choice. Any arbitration hearing will take place at a location reasonably convenient to Borrower. At Borrower's written request, Lender or the holder of the promissory note or this agreement will advance any arbitration filing fee or administrative and hearing fees which Borrower is required to pay to pursue a Claim subject to the arbitrator ultimately deciding who must be responsible for paying those fees. In no event will Borrower be required to reimburse Lender or the holder of the promissory note or this agreement for any filing, administrative or hearing fees in an amount greater than what the costs would have been had the Claim been resolved in a court with jurisdiction. The parties agree that the arbitrator shall have all powers provided by law and this agreement. These powers include all legal and equitable remedies, including but not limited to the power to decide money damages and issue declaratory or injunctive relief. Judgment upon an arbitration award may be entered in any court having jurisdiction. A demand for arbitration may be made before or after the beginning of any legal proceeding; however, any demand made after the initiation of a legal proceeding must be made within sixty (60) days following the service of a complaint, third-party complaint, cross-claim, or counterclaim.

The parties acknowledge and agree that this agreement to arbitrate is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT OR OPPORTUNITY TO INDIVIDUALLY, OR AS PART OF A CLASS ACTION, LITIGATE CLAIMS IN COURT REGARDING THIS AGREEMENT OR THIS ARBITRATION CLAUSE AND CHOOSE INDIVIDUAL (NOT CLASS) BINDING ARBITRATION TO RESOLVE ALL CLAIMS AND SHALL INCLUDE NO OTHER (EVEN IDENTICAL) DISPUTE WITH ANOTHER CUSTOMER OR BORROWER, EXCEPT AS SPECIFICALLY PROVIDED HEREIN.

This arbitration agreement, unless prohibited by applicable law, applies to all Claims specified above, whether now in existence or arising in the future and shall survive the voluntary payment of debt in full, any bankruptcy, or sale of the debt, EXCEPT nothing in this arbitration agreement shall be construed to prevent either party from using self-help repossession, replevin, judicial or non-judicial foreclosure or any other form of relief allowed by law to enforce a security interest. The institution and maintenance of such litigation shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration pursuant to this arbitration agreement.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** What is written in this Deed of Trust and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Deed of Trust. To be effective, any change or amendment to this Deed of Trust must be in writing and must be signed



Any areas where this is present represent redacted information.

by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by and interpreted by and interpreted in accordance with federal law and the laws of the Commonwealth of Virginia. This Deed of Trust has been accepted by Lender in the Commonwealth of Virginia.

**Joint and Several Liability.** All obligations of Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Deed of Trust unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Deed of Trust. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Deed of Trust is not valid or should not be enforced, that fact by itself will not mean that the rest of this Deed of Trust will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Deed of Trust even if a provision of this Deed of Trust may be found to be invalid or unenforceable.

**Non-Liability of Lender.** The relationship between Grantor and Lender created by this Deed of Trust is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Grantor. Grantor is exercising Grantor's own judgement with respect to Grantor's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Grantor of any matter with respect to Grantor's business. Lender and Grantor intend that Lender may reasonably rely on all information supplied by Grantor to Lender, together with all representations and warranties given by Grantor to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Homestead Waiver.** Grantor waives the benefit of Grantor's homestead exemption as to the Property described in this Deed of Trust.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

**DEFINITIONS.** The following words shall have the following meanings when used in this Deed of Trust:

**Beneficiary.** The word "Beneficiary" means SunTrust Bank, and its successors and assigns.

**Borrower.** The word "Borrower" means MARLIN F REKOW and SHEILA A REKOW and includes all co-signers and co-makers signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated April 6, 2005, with credit limit of $250,000.00 from Grantor to Lender, together with all modifications of and renewals, replacements, and substitutions for the promissory note or agreement. **NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**



Any areas where this is present represent redacted information.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Grantor.** The word "Grantor" means MARLIN F REKOW and SHEILA A REKOW.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means SunTrust Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means Cecil STONE, whose address is 1001 Semmes Avenue, Richmond, VA 23224 and Shelia THOMPSON, whose address is 1001 Semmes Avenue, Richmond, VA 23224 and any substitute or successor trustees. If more than one person is named as trustee, the word "Trustee" means each such person.

Any areas where this is present represent redacted information.

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND EACH GRANTOR AGREES TO ITS TERMS.

THIS DEED OF TRUST IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS DEED OF TRUST IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _____(Seal)
**MARLIN F REKOW**

X _____(Seal)
**SHEILA A REKOW**

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Virginia_                              )
                                                 ) SS
COUNTY OF _Prince William_                       )

On this day before me, the undersigned Notary Public, personally appeared **MARLIN F REKOW**, to me known to be the individual described in and who executed the Deed of Trust, and acknowledged that he or she signed the Deed of Trust as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this __1__ day of _April_, 20_05_

By _Barbara A Fuller_                 Residing at _8751 Sudley Rd_
                                      _Manassas, Va 20110_
Notary Public in and for _Virginia_  My commission expires _6-30-2007_

---

**Any** areas where this is present represent redacted information.

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Virginia_ )
) SS
COUNTY OF _Prince William_ )

On this day before me, the undersigned Notary Public, personally appeared **SHEILA A REKOW**, to me known to be the individual described in and who executed the Deed of Trust, and acknowledged that he or she signed the Deed of Trust as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _18th_ day of _April_ , 20_05_

By _Barbara J. Fuller_          Residing at _8751 Sudley Rd Manassas, VA 20110_

Notary Public in and for _Virginia_          My commission expires _6·30·2007_

LASER PRO Lending, Ver. 5.24.10.002 Copr. Harland Financial Solutions, Inc. 1997, 2005. All Rights Reserved. VA E:\LPRO\CFI\LPL\G01.FC TR-2188v4 PR-NCGN

████████████

**Any** areas where this is present
**represent** redacted information.

05052042550 6

*05-881-15*

F112F9HT

# SCHEDULE A

THAT CERTAIN PIECE OR PARCEL OF LAND, AND THE BUILDINGS

AND IMPROVEMENTS THEREON, KNOWN AS: 64 GORDON CLAN LN

IN THE TOWN OF: HUNTLY

COUNTY OF: RAPPAHANNOCK

STATE OF: VIRGINIA

BEING MORE PARTICULARLY DESCRIBED IN A DEED RECORDED IN:

DOCUMENT NUMBER: 1561

PROPERTY IDENTIFICATION:

PIN: 5-1-16H

PROPERTY DESCRIPTION:

LOT: 1B1

ACREAGE: 30.4502

INSTRUMENT #050000881
RECORDED IN THE CLERK'S OFFICE OF
COUNTY OF RAPPAHANNOCK ON
MAY 9, 2005 AT 12:40PM
DIANE BRUCE, CLERK

RECORDED BY: MRR